MR. WALTHER: Doesn't your Honor define threat of force in here somewhere?

THE COURT: Yes.

MR. WALTHER: Your Honor defines it as threatens the immediate use of force upon another person would mean a show of power or strength sufficient to compel the giving up of property. It doesn't necessarily imply physical violence.

THE COURT: Yes. And that phrase comes out of our pattern instructions, I believe. So I'm not sure I understand your application, if any, Mr. Bartley.

MR. BARTLEY: Well, the State still has to prove that my client threatened the use of immediate force during the commission of the robbery.

MR. WALTHER: My point, your Honor, is it doesn't have to be verbal, as your Honor will instruct the jury. I can come up from behind somebody at a teller machine and just use the force. I can come up and hit them over the head with a gun, or stab them in the back and take their money. I've committed the crime of Robbery I.

THE COURT: I think the State has the better

of the argument. Mr. Bartley, are you suggesting that the robbery first instruction is incorrect in some way? Or are you just trying to preserve your --

MR. BARTLEY: I'm trying to preserve my defense theory, which is contained in the instruction I'm asking for, which --

THE COURT: All right. But do you maintain or suggest that the instruction for robbery in the first degree is incorrect?

MR. BARTLEY: No.

THE COURT: All right. Any other suggestions from defense with respect to jury instructions?

MR. BARTLEY: Yes. And this would be a sentence after Mr. Walther's last request. This is a Dixon -- comes out of the case of Lloyd Dixon vs. State. The Supreme Court essentially ruled that force used for purposes of escaping a theft, once the theft has been abandoned, does not support a robbery conviction.

MR. WALTHER: Your Honor, the State would oppose that instruction, because that refers only to abandoned property. And under these circumstances,

clearly this was a theft inside the establishment, he was attempting to leave the store. The confrontation occurred, and the property dropped out. There's no evidence that he abandoned it. The evidence was that there was a tussle, and the property dropped out. And, in addition to that, he still had property on him that belonged to the establishment. Therefore, there is no abandonment.

Now, I think if at some later point, maybe out in the parking lot, or going down Kirkwood Highway he throws the property out and then there's a confrontation -- I think this is too close to the nexus of the crime for a reasonable person to conclude that the property was abandoned under the facts of this case.

THE COURT: (Pause.) The reason I'm hesitating is that I had thought there was a legislative response to the Dixon case. And I think there was. But that's not important to my decision. I'm not going to give the defendant's requested instruction because I agree completely with the State's position that there has been no evidence of abandonment of stolen property in this case. The

uncontradicted testimony is that the stolen property remained on the defendant's person up until the very moment that he was finally subdued. So I'll ask the prothonotary to docket defendant's proposed Dixon instruction. And defendant is noted as having an exception to that.

Anything further before I make a decision on the lesser includeds? Any more jury instructions?

MR. BARTLEY: May I have one moment, your Honor?

THE COURT: Yes.

(Mr. Bartley confers with Mr. Roane.)

THE COURT: Excuse me. Mr. Bartley, was there anything further that you wished? I don't know if you were conferring.

MR. BARTLEY: My client was concerned about the fact that he recalled hearing testimony that would have supported our defense theory, you know, namely, that there was the items fell out of his clothes before there was any actual physical confrontation, where there's actual physical contact. And there was no testimony from the trooper that any items were pulled out of his clothes. And he thought

Ex. C (31)

I think its relevance relates to the evidence of force used in the robbery. Now, second issue, you said you asked for notes of witnesses, told there were none from this witness, but apparently he does have notes.

MR. BARTLEY: Well, he appears to have notes, could very well be his own notes. But if they're not medical records, that's fine, I'll ask for them at the conclusion of his testimony.

MR. WALTHER: Your Honor, I will take a look at what he has, certainly provide any Jencks material. I haven't seen those, either.

MR. BARTLEY: I want all four pieces of --

THE COURT: Wait. Also, we don't know if he's used them to refresh his recollection or not. I think we'll take a recess after the conclusion of direct examination and then sort out these issues, as I'm sure counsel could do so, postpone ruling on that totally until the conclusion of his direct examination.

(Sidebar concluded.)

MR. WALTHER: May I proceed, your Honor?

THE COURT: Yes.

BY MR. WALTHER:

Q. I believe you indicated that you went to the doctor. Were you prescribed any medication?

A. Yes, sir, I was.

Q. And what were you prescribed?

A. Going to have to help me try to pronounce this.

Q. No. In general, what was it?

A. First of all, I got a Tetanus shot. Then, it's Clindamycim, C-l-i-n-d-a-m-y-c-i-m, 150 milligram capsules, take two tablets four times a day till gone. These are antibiotics. And, also, it's C-i-p-r-o-f-l-o-x-a-c-i-n, 500 milligrams, one tablet every 12 hours till gone.

Q. Now, did their come a time that the police were called?

A. Yes, at the -- during the incident, sir?

Q. Yes.

A. Yes.

Q. And were you there when they responded?

A. Yes. We were still entangled on the floor.

Q. And when the police responded, was the defendant taken into custody?

A. Yes. He was put in handcuffs and taken into custody.

Q. And was he in the police -- strike that.

At some point did the police take him from the store?

A. Yes, they did.

Q. Now, after the defendant was taken from the store, did you have occasion to observe the items that were on the floor that fell out of his jacket?

A. They were all over the floor, yes, sir, I did.

Q. All right. And did you make note of the items that had fallen from his jacket onto the floor?

A. Yes, sir.

Q. And were those marked as merchandise from the Dollar General Store?

A. Yes.

Q. And what items fell out of his jacket onto the floor? Right Here

A. Okay. We got... men's T-shirts, okay, valued at $24. We got blue jeans valued at $10. Boxer shorts valued at $24. Men's boxer shorts valued at $25. And it came to a total of $83.

Q. Now, at any time either during the robbery or after he was subdued, did the defendant say anything to you?

A. He was sitting on the floor, and he kept looking at me telling me, "I'm sorry, I'm sorry." That was the only thing he said to me, "I'm sorry."

Q. Did he indicate to you at all what he wanted you to do with him?

A. No.

Q. Did he make any admission to you?

A. No. He just says, "I'm sorry."

MR. WALTHER: Nothing further, your Honor.

THE COURT: We're going to take a brief recess before cross-examination. Please take out the jury.

(Jury leaves the courtroom at 11:56 a.m.)

THE COURT: I think what I'll do is just, we'll go through a recess now, I'll remain on the bench, but we're not in session, and I'll let counsel see if you can try to resolve the issue of the notes. Presumably, you can do that. So we're in recess.

MR. BARTLEY: Can I do my voir dire, your Honor, so there's a record?

Ex. C (32)

White - Direct

53

A. Yes.
Q. You did?
A. Yeah. Because she had -- she's never sounded like that before, she had urgency in her voice, so.
Q. It was loud enough for you to hear it, too?
A. Yes.
Q. Now, you've put lines in State's for Identification A. What are those lines?
A. These are the aisles.
Q. And how high -- strike that.
Are there items down the aisles?
A. Yes.
Q. Are they on shelves?
A. Yes.
Q. How high are the shelves?
A. Probably about six feet. But there's an overlook inside each shelf, also.
Q. So that you can look to the front of the store?
A. Yes.
Q. Now, could you mark on State's for Identification A with your initials where you were

White - Direct

54

standing in relationship to the defendant and Darris Hensley?
A. At what time?
Q. When you approached the front of the store.
A. Okay. I came right up here (indicating).
Q. Now, when you got to that position that you just marked on State's for Identification A, did Darris Hensley have her hands on the defendant?
A. No. She was holding on to the door. It has a, the door has a handle on it that you push open.
Q. And as she's holding on to the door, what is the defendant doing?
A. He's trying to push the door open.
Q. Was she attempting to prevent him from leaving the store?
A. Yes.
Q. And what was going through your mind at that time?
A. I didn't know what was going on, I figured it was somebody that was trying to steal something, and I told him that we had to talk to him.
Q. And what effort did you make to ascertain what the facts were?

White - Direct

55

A. I just held on to the door myself and said that we had to talk to him, if he could, you know, stop and talk. And he just kept saying, no, he wants to leave, he just wants to go.
Q. What did you do in response to that?
A. I don't remember.
Q. Well, did you attempt to prevent him from leaving?
A. I was holding on to the door so he couldn't push it open, yeah.
Q. And, I mean, how much time has elapsed, and what's going on here?
A. It was a matter of a couple minutes, if that.
Q. What, if anything, did you do to prevent him from leaving the store?
A. To hold the door.
Q. Other than that.
A. Well, at that time, that's when he went to go push it, all the stuff fell out that he had in his jacket. And at that time he had gave my assistant a little shove, so I put, I think I put my arms around him, I can't remember. And I called for Jim Casula.

White - Direct

56

Q. And did Mr. Casula respond to the front of the store?
A. Yes.
Q. And what did Mr. Casula do?
A. He helped restrain him, also.
Q. And what's the defendant doing during this period of time?
A. He's struggling, telling us that we got the merchandise, just leave him go. He said, "It's all there, just leave me go, I just want to go."
Q. Of course, you didn't leave him go, correct?
A. No.
Q. And what happened at that point?
A. Eventually we had got him down on the ground. And I don't remember exactly how we got him down onto the ground, and he started struggling. And we told Cathy to call the cops, which I guess she had because they had showed up. And during all this time we were just struggling just trying to keep him on the ground until they came.
Q. And was he trying to leave at that time?
A. Yes. He was still trying to push his way out the door and pull on the door jam to try to pull

Ex. C (33)

his way up

Q. Now, were you there when the police responded?

A. Yes.

MR. WALTHER: I have nothing further, your Honor. I'd ask that that be marked as State's Exhibit 1.

MR. BARTLEY: No objection, your honor.

THE COURT: Without objection, mark it as State's Exhibit No. 1.

Mr. Bartley, you may cross-examine.

MR. BARTLEY: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. BARTLEY:

Q. You marked for Mr. Walther the location where you first came into confrontation with the, confrontation or contact with the defendant; is that correct?

A. Yes.

Q. Did the struggle remain there throughout the entire?

A. Yes, yeah.

Q. And you also told the jury that the

defendant was trying to force his way out of the store?

A. Yes.

Q. And what he was essentially trying to do, am I correct, is that he was trying to push the door open while you, while your employee and then you were trying to keep and pull it shut?

A. Yes, he was.

Q. And at some point you recall early in the process that he gave it a heavy push, and merchandise fell all out?

A. Well, I don't know what kind of a push it was, but I know as he was trying to struggle to get the door open is when the merchandise fell out. And it was, it wasn't too much longer after I got up there and held on to the door that it had all came out.

Q. Okay. Well, after all the merchandise had fallen out and was on the floor, how long did it take you then to summon additional help?

A. It was just shortly right after that, because he had given Darris a little, like, nudge, or push, or whatever, and just at that time I had called

for Jim.

Q. So the state, as you recall it, is that just before you called for Jim things had changed in two ways: the pull had escalated, and that you think one of your employees got pushed a little, Darris?

A. Yes.

Q. And the merchandise had all fallen out, and the defendant adopted a different stance, hey, look, you got the merchandise, just let me get out of the store?

A. Yes.

Q. And then Jim arrives on the scene how many minutes later?

A. It was like 30 seconds later. He was just in, I think he was like in the next aisle over.

Q. But you're clear on that that Jim arrived 30 seconds after that; is that right?

A. Well, I don't know exactly time-wise.

Q. I'm sorry. You're clear that he arrived a short period later; is that correct?

A. He arrived, it was probably sometime right about the time the stuff was falling out.

Q. Okay. But you remembered the stuff fell out

as a result of him, of the defendant pushing against the door?

A. Yeah, I mean, it didn't all just go, "phew," I mean, some pieces fell out here and there, but there was a big portion of it that fell out. And then afterwards there was stuff that was taken out of his jacket, also, after the cops arrived.

Q. And that would have been which?

A. A pair of jeans.

Q. One pair of jeans?

A. Yeah. It was taken out of, I think, the sleeve of the jacket that he was wearing.

Q. Now, did you recall the defendant apologizing at any point in time?

A. I believe he did. I don't remember.

Q. Do you recall him saying anything other than words to the effect of let me go, you have the merchandise now?

A. He was talking about a needle that he had. He was saying that his needle was jabbing him, and saying that he couldn't breathe.

Q. Okay. And that's all you can recall him saying; is that correct?

MR. WALTHER: Doesn't your Honor define threat of force in here somewhere?

THE COURT: Yes.

MR. WALTHER: Your Honor defines it as threatens the immediate use of force upon another person would mean a show of power or strength sufficient to compel the giving up of property. It doesn't necessarily imply physical violence.

THE COURT: Yes. And that phrase comes out of our pattern instructions, I believe. So I'm not sure I understand your application, if any. Mr. Bartley.

MR. BARTLEY: Well, the State still has to prove that my client threatened the use of immediate force during the commission of the robbery.

MR. WALTHER: My point, your Honor, is it doesn't have to be verbal, as your Honor will instruct the jury. I can come up from behind somebody at a teller machine and just use the force. I can come up and hit them over the head with a gun, or stab them in the back and take their money. I've committed the crime of Robbery I.

THE COURT: I think the State has the better of the argument. Mr. Bartley, are you suggesting that the robbery first instruction is incorrect in some way? Or are you just trying to preserve your --

MR. BARTLEY: I'm trying to preserve my defense theory, which is contained in the instruction I'm asking for, which --

THE COURT: All right. But do you maintain or suggest that the instruction for robbery in the first degree is incorrect?

MR. BARTLEY: No.

THE COURT: All right. Any other suggestions from defense with respect to jury instructions?

MR. BARTLEY: Yes. And this would be a sentence after Mr. Walther's last request. This is a Dixon -- comes out of the case of Lloyd Dixon vs. State. The Supreme Court essentially ruled that force used for purposes of escaping a theft, once the theft has been abandoned, does not support a robbery conviction.

MR. WALTHER: Your Honor, the State would oppose that instruction, because that refers only to abandoned property. And under these circumstances, [illegible] this was a theft inside the establishment, he was attempting to leave the store. The confrontation occurred, and the property dropped out. There's no evidence that he abandoned it. The evidence was that there was a tussle, and the property dropped out. And, in addition to that, he still had property on him that belonged to the establishment. Therefore, there is no abandonment.

Now, I think if at some later point, maybe out in the parking lot, or going down Kirkwood Highway he throws the property out and then there's a confrontation -- I think this is too close to the nexus of the crime for a reasonable person to conclude that the property was abandoned under the facts of this case.

THE COURT: (Pause.) The reason I'm hesitating is that I had thought there was a legislative response to the Dixon case. And I think there was. But that's not important to my decision. I'm not going to give the defendant's requested instruction because I agree completely with the State's position that there has been no evidence of abandonment of stolen property in this case. The uncontradicted testimony is that the stolen property remained on the defendant's person up until the very moment that he was finally subdued. So I'll ask the prothonotary to docket defendant's proposed Dixon instruction. And defendant is noted as having an exception to that.

Anything further before I make a decision on the lesser includeds? Any more jury instructions?

MR. BARTLEY: May I have one moment, your Honor?

THE COURT: Yes.

(Mr. Bartley confers with Mr. Roane.)

THE COURT: Excuse me. Mr. Bartley, was there anything further that you wished? I don't know if you were conferring.

MR. BARTLEY: My client was concerned about the fact that he recalled hearing testimony that would have supported our defense theory, you know, namely, that there was the items fell out of his clothes before there was any actual physical confrontation, where there's actual physical contact. And there was no testimony from the trooper that any items were pulled out of his clothes. And he thought

Ex. C (35)

that was germane and the Court should consider that. I told him that that would be in the record and on appeal, if the Supreme Court would consider that.

THE COURT: Well, let me just ask the State for its recollection of testimony in the case of all of the -- well, of any abandonment of the property. The defense is suggesting that there was some suggestion in the testimony that some testimony could be interpreted to mean that the defendant had shed himself or gotten rid of all the stolen items before he was finally apprehended.

MR. WALTHER: My recollection of this, of the testimony of Christopher -- of Mr. White and Mr. Casula was that it was pretty much contemporaneous with while they are together. And there's no indication that there was a clear abandonment by the defendant. And the facts of this case, there is a struggle, all right. He's intending to prevent or overcome resistance, their resistance to his taking the property. And during the struggle some of the merchandise falls out of his jacket. He doesn't abandon it, it falls out of his jacket. And, notwithstanding that, even after the whole thing is

over, he still has property on him. And even if they reached that factual conclusion, the jeans were still stuffed down his jacket. And with regard to the trooper, there was no testimony along those lines because no one asked him any questions.

THE COURT: Just in final rejoinder, Mr. Bartley.

MR. BARTLEY: (Pause.) It just escaped me. I can't recall it, your Honor.

THE COURT: Well, I'm going to just recess for a moment to think about this issue of, if I should give it, two lesser includeds, including the assault third, as well. So we'll be in brief recess until I come back.

(Recess taken, 2:25 to 2:41 p.m.)

THE COURT: Let's bring in the defendant. We need to wait until the defendant comes in.

(Kyle Roane is brought into the courtroom.)

THE COURT: Counsel, I've decided I will give the lesser included offenses of theft misdemeanor and assault third degree. I think there's, under a liberal construction of the facts from the defendant's [illegible]

the evidence. So that's what I do. The elements of assault third degree will be [illegible] of physical injury.

MR. BARTLEY: Thank you, your Honor.

MR. WALTHER: I just wanted to point out to your Honor that I was trying to recall the case that talked about assault and robbery and whether or not they were included offenses. And looking at the annotations, Hackett vs. State, it says, The offenses of first degree robbery and first degree assault under 610 of this title are not lesser included offenses of each other. I knew there was a case that talked a little bit about that. But I, I'm sorry, I did not anticipate the defense requesting an assault instruction, therefore, I did not bring that case with me.

THE COURT: Fair enough.

MR. WALTHER: I don't know what the circumstances of that case were.

THE COURT: Well, in the Frink case, I'll just quote briefly. The defendant, it says, in Frink, quote, The defendant contends on appeal that, one, the trial judge erred in refusing to instruct the

jury on the elements of assault third degree as a lesser included offense of robbery first degree. This is a 2000 order. And the Supreme Court said, with regard to Frink's first contention, Theoretically, assault third degree may be considered a lesser included offense under a charge of robbery first degree.

So the Supreme Court did say that. So under the circumstances I will give that lesser included instruction.

Please bring in the jury. My secretary is bringing down jury instructions.

(Jury enters the courtroom at 2:45 p.m.)

THE COURT: Sorry for the delay in getting started, members of the jury, but we are ready to proceed now.

The State has rested. Mr. Bartley.

MR. BARTLEY: Your Honor, I'm content to rely on the evidence that I developed through cross-examination and the direct examination, so we want to rest.

THE COURT: The defense rests. So there's no rebuttal evidence because that's not appropriate.